ISABELLA McDONELL v. THE RIFLE BOOM CO.

*Master and servant—Negligence—Independent contractor—Liability of contractee—Logs and logging—Charge to jury— Interest of witness.*

1. Where a boom company, having full control and management of a stream and the dams thereon, contracts for driving logs therein, the reasonable performance of which contract *obliges* the contractor to so run and manage the logs and water as to damage riparian owners, such damage is legally attributable to the company, and may be recovered of it.

2. The interest of a witness is to be always weighed and considered by the jury, and when referred to by counsel, as they have a right to do, it is not error for the court to instruct the jury that, if the interest or employment of such witness has impaired or biased his judgment, such fact may be considered by them in weighing the value of his testimony.

Error to Arenac. (Green, J.) Argued May 17 and 18, 1888. Decided June 22, 1888.

Case for flooding plaintiff's land. Defendant brings error. Affirmed. The facts are stated in the opinion.

*Shepard & Lyon,* for appellant, contended:

1. When work is performed by a contractor, and no control is reserved over the work or the workmen by the party for whom the work is done, the relation of master and servant does not exist, and the contractee is not liable for the negligence and improper performance of the work by the contractor; citing *DeForrest v. Wright,* 2 Mich. 368; *Moore v. Sanborne,* Id. 529; *Gardner v. Smith,* 7 Id. 421; *McCafferty v. Railroad Co.,* 61 N. Y. 178; *Eaton v. Railway Co.,* 59 Me. 520.

*Simonson, Gillett & Courtright,* for plaintiff.

MORSE, J. The plaintiff is owner of 40 acres of land upon the Rifle river, and about 12 miles up the stream from its mouth. She purchased this land for farming

purposes, in 1872, and has since owned and up to 1884 been in actual occupation of the same.

The defendant is a corporation organized under the laws ·of this State, and operating upon the Rifle river, running .and booming logs.

Plaintiff sues for damages sustained, as she claims, in the years 1876, '77, .'78, '79, '80, and '81, by the overflow ·of her lands by water caused by the operations of the defendant in running and driving logs down said river. In the circuit court for the county of Arenac she recov- ·ered a verdict for $625, and judgment was entered upon the same. The defendant brings error. Its complaint is directed entirely against the charge of the court.

There does not seem to have been, on the trial, any very serious dispute as to the damage done plaintiff by the running of logs upon the river in all, or at least some, of these years. The main controversy turned upon the question, who was responsible for it? The defendant did not run or drive these logs directly by its own employés, but the same was done under contract; and it ·claims that the control of the river, the dams upon it, and the logs while they were being run or driven each year, was by the defendant turned over to the contractor or contractors. The defendant contends that it did not direct or control the mode in which the river should be driven by the contractors, and exercised no control over them or the men in their employ relative to the driving ·of the logs in the river or the management of the dams thereon, and that, consequently, it was not responsible for the action of said contractors or their employés.

There is a small stream called the "Dead Branch," running through plaintiff's land, and emptying into the Rifle river. The boom company controls the Rifle for from 60 to 80 miles above its mouth. It owns two upper dams on the river, and leases what is known as the

"Lower Dam," which is located some three or four miles above the plaintiff's premises.    The company runs out of the river each year from 60 to ·110 million feet of logs. These dams are used to collect and hold the water until such times as they choose to let it out and flood the stream for the purposes of floating.    It is claimed that the lower dam is also used for sorting purposes, and that, every time the water is let out of this dam for either driving or sorting purposes, the Rifle is raised so high that the water backs up the Dead Branch, and overflows the lands of the plaintiff.

At the mouth of the river the company maintained a large boom, and it has driven piles in the stream 40 or 50 rods from its mouth across the full width of it, leaving a small space or channel in the center.    Seventy or eighty rods above this first row of piles is another, driven in the same manner, and eighty rods above this another lot of piles are driven in the center of the stream, called "Jam Piles."    Boom sticks are stretched across the spaces left in the river, which boom sticks are fastened to piles driven in the river or on the shore, completely obstructing the river when desired.    The company constructed dredge cuts on either side of the river near its mouth, small cuts, 25 or 30 feet wide, dredged out from the river, and leading into Saginaw bay.    These cuts are used for sorting purposes.    The company stops, stores, and sorts in the river all logs.    The logs are stopped at the jam piles as they come down the stream, by means of the boom sticks stretched from such piles to the shore, and the logs are held in the stream until sorted and passed through the dredge cuts to the bay.

It is admitted that these logs cannot be sorted successfully in this manner without keeping, during the driving season, a jam in some portion of the river all the time.    Logs cannot be sorted without stopping them, and

the business cannot be done without creating a jam in the river, and this jam must necessarily be above the sorting ground. It is claimed that this jam would often be several miles in length up the stream, causing the water to be more or less obstructed in its flow, and setting it back up into the Dead Branch, overflowing plaintiff's land. The injuries resulted from this cause and the letting off water from the lower dam, as heretofore stated.

The contracts of the boom company with the persons who were to drive the logs provided that they should drive and deliver to the company,—

"To solid jam at or below the prairie, so called, about two and one-half miles above the mouth of said river, being the first bend below the point where the telegraph line strikes the bank of said river. * * * No logs shall be left from the forks down, either in the stream or on the banks, and the logs are to be driven in below said bend in the prairie as fast as space is made therefor by the removal of logs below by said company; and said first party [the contractor] shall not at any time suffer any space next below said bend in the prairie to remain unfilled with logs for more than twelve hours until the whole of said logs shall be delivered below said point."

It will thus be seen that the contractors were required by the boom company to keep during the driving season, and until the whole of the logs were run down, a jam of logs two and one-half miles above the mouth of the river, so as to keep the space below and between said jam and the sorting grounds filled with logs as fast as the company wanted to use them.

The court below charged the jury in substance that if, in order to fulfill this contract or contracts, which were all substantially alike, it was necessary that such quantities of logs should be kept below the lower dam as would cause a solid jam of several miles in length, and by so doing the water was backed upon plaintiff's land, the defendant was liable.

This proposition was correct; and it needs no argument to sustain it. The defendant had exclusive control and management of this river, in the first place, and if, in turning over its control to a contractor, it burdened such contractor with conditions which, if complied with, necessarily caused damage to plaintiff, it became responsible for such damage. The question was left to the jury to say whether or not this contract could have been performed by the contractor without damage to the plaintiff, and they were instructed that, if they found it could have been so performed, then the contractor, and not the company, would be liable for the injuries done plaintiff.

The jury were also instructed as to the letting out of water from the lower dam, and the injuries resulting therefrom. They were told, in effect, as in relation to the jams, that if it was necessary, in order to fulfill their contract with the company, to so flood the river as to damage plaintiff, then the company must settle for such damage; but if it was not necessary, the contractor must be the one to recompense the plaintiff. These instructions were in accordance with the well-settled general principles of the law as applied to contractors, and were as favorable to the defendant as it could ask.

If, in order to properly and reasonably perform these contracts, the provisions of which were dictated by the company, who, previous to the making of the same, had full control and management of this stream and the dams thereon, the contractors were obliged to so run and manage the logs and water in the river as to damage plaintiff, such damage is legitimately attributable to the company, and the defendant is beyond doubt responsible for it. In such case it cannot properly be said that the company reserves no control over the work, and the relation of master and servant does not exist. The contract

71 Mich. 5.

controls and directs the action which causes the injury, and the contractor, in following the contract, becomes the agent or servant of the company. It is by no means certain that the boom company could escape responsibility in any event; but, as this point was not raised upon the argument, we pass it.

It is further contended that the court erred in directing the jury as follows:

" Now, it is said that some of these witnesses are interested in or in the employ of the boom company, and you are to consider that circumstance in weighing your testimony. You have a right to do that, gentlemen, and if you think that any circumstance of that kind has operated upon their judgment, so that they have not been able to form an impartial judgment, you must consider their testimony for what it is worth."

The court further stated, which is not complained of, immediately in the same connection, as follows:

" You will consider also that men and women may be operated upon by their sympathies one way or another. The sympathies of people come out sometimes very strongly in favor of the weaker party, or the female sex, or the poor man when he is in controversy with the rich man; but jurors have no right to act upon any prejudice or any sympathy of that kind. You are to try to do exact justice between the parties, just as though they were two individuals standing upon perfect equality in all respects. Their rights are the same, and your duties are the same, and they are not to be evaded."

It is apparent, from the reading of this part of the charge, that reference had been made upon the trial to the interest or bias of these witnesses, and also that some appeal had been made to the prejudice of the jury in favor of the plaintiff, or that something had been said in deprecation of the influence of such prejudice or of sympathy in her behalf.

It seems to me that the court stated the law correctly

in both of the quotations above noticed. The interest of
a witness is to be always weighed and considered by the
jury, and there could be no harm or impropriety, under
the circumstances of this case, in what the circuit judge
said. When counsel have referred to this interest, as they
had the right to do, and when the jury may consider it,
it certainly is not error for the court to instruct the jury,
as he did in this case, that, if the interest or employment
of a witness has impaired or biased his judgment, such
fact may be considered by them in weighing the value of
his testimony.

The cases of *Marquette, etc., R. R. Co. v. Kirkwood,*
45 Mich. 51 (7 N. W. Rep. 209), and *Cronkhite v. Dick-
erson,* 51 Id. 177 (16 N. W. Rep. 371), are not in point.
In the first case the circuit judge told the jury that, if
they found it necessary to consider the testimony given
by the agents or employés of the railroad, " they should
bear in mind the interest" such agents and employés
have in protecting their company, and shielding them-
selves. It was properly held in such case by this Court
that the judge erred in thus suggesting to the jury that
suspicion attached to the testimony of these persons.
But that is not this case. Nothing of this character was
suggested by the court below, but the jury were properly
advised of their right to take notice of the interest or
employment of a witness, if such interest or employment
had in any wise affected the credibility of their testi-
mony. The other case has no bearing whatever, as the
objectionable remark of the court was made during the
trial, and did not relate to any bias or interest of a wit-
ness.

It is strenuously urged that the defendant was, by the
charge of the court, held liable for all the damage the
plaintiff sustained by floods coming down upon the jam,
and causing the water to overflow her lands; that it did

not limit the liability in any manner to floods caused by an unreasonable flooding of the river on account of the maintenance of the jams provided for in the contract, but fastened upon the defendant a liability for all damage caused by floods from the dams that came down upon the jam, and set back upon plaintiff's land ; that the question of the necessity of letting off floods from the dams in order to carry out the contract was not submitted to the jury, but, if the jams were necessary to fulfill the contract, the jury were, in effect, told that the defendant was liable for all the damages caused both by the jams and the floods from the dams, thus treating in such case both the jams and floods as necessary to the performance of the contract.

We do not think the charge of the court is open to this claim against it. The jury were plainly informed that no matter what control the company may have had over the dams, if it did not exercise such control, or if it turned it over to the contractor, so far as the running of logs was concerned, and did not interfere with it at all, then the act of flooding for the purpose of running the logs would be the act of the contractor. If the contractor could have run the logs according to the contract without flooding the plaintiff's premises, the jury were told that he alone would be responsible for the damage.

" But if you shall find that, in order to fulfill this contract, it was necessary to place such quantities of logs below the lower dam *as that the flooding which was used* caused the overflow, then I say that the boom company would be liable."

This certainly made the defendant responsible only for such flooding from the dams as was rendered necessary in the performance of the contract.

The judgment is affirmed.

The other Justices concurred.